**John YANCEY, d/b/a the Yancey Agency, Appellant,**

v.

**FLOYD WEST & COMPANY, Crum & Forster Insurance Companies, and United States Fire Insurance Company, Appellees.**

No. 2–87–263–CV.

Court of Appeals of Texas, Fort Worth.

July 28, 1988.

Rehearing Denied Sept. 8, 1988.

Mark A. Hendrix and D. Bradley Dickinson, Vial, Hamilton, Koch & Knox, Dallas, for appellees.

Elvin E. Tackett, Grapevine, for appellant.

Before BURDOCK, FARRIS and LATTIMORE, JJ.

## OPINION

LATTIMORE, Justice.

Appellant, plaintiff below, brought suit against appellees seeking damages for: alleged failure to provide a defense against intervenor, Midway Camp, pursuant to an insurance contract; violations of the Texas Deceptive Trade Practices Act; and viola-

tions of article 21.21 of the Insurance Code. Appellees requested, and the trial court granted, summary judgment contending appellant was not covered by any of the applicable policies for the claim at issue.

Appellant brings three points of error alleging error in granting summary judgment.

We affirm.

Due to the complexity of the order of events, a statement of the facts is necessary. Appellant operated a business known as The Yancey Agency which was engaged in the sale of insurance policies to the general public. In 1980, appellant procured an underlying policy of insurance from United States Fire Insurance Company ("USFIC") through Floyd West & Company ("West") and Crum & Forster Insurance Companies ("CFIC"), bearing a policy number of 540 285295 5 ("Yancey policy"). This policy had an effective policy period of July 14, 1980 through July 14, 1981. Appellant further obtained an "umbrella policy" ("Yancey umbrella policy"), policy number 523 157095 8, which is additional coverage that did not go into effect until the limits of the underlying policy were first exhausted. The Yancey umbrella policy had a policy period of July 14, 1981 through July 14, 1982. On page two of the Yancey umbrella policy was a "supplemental declarations" sheet, reflecting that the primary policy was effective until July 14, 1982.

On April 1, 1982, Yancey sold the assets of The Yancey Agency to Diversified Insurance Services, Inc. ("Diversified"); as of that date, Yancey became an employee of Diversified. At the time of the sale, Diversified had its own underlying policy of insurance applicable to its business operations, issued by USFIC, bearing a policy number of 540 391 791 6 ("Diversified policy"). This policy was in effect from January 29, 1982 through January 29, 1983. Diversified also had an umbrella policy ("Diversified umbrella policy"), number 523 144999 8, with attached supplemental declarations sheet stating the effective date of the umbrella policy from January 29, 1982 through January 29, 1983. By endorsement effective April 23, 1982, Yancey became an additional insured under the Diversified policy.

Intervenor Midway Camp ("Midway"), an insurance customer of appellant, wrote a demand letter on September 10, 1982, alleging appellant made an error and omission in failing to procure for Midway flood insurance beginning during the period of October 1981. Midway requested flood coverage from appellant, who agreed to submit an application for coverage on their behalf but failed to do so. Approximately nine days later Midway's property was flooded. Appellees refused to undertake Yancey's defense in the Midway action on the basis that no claim was made during the term of the policies issued to Yancey, and the Diversified policies did not provide for coverage for alleged errors and omissions on the part of Yancey prior to the policy's retroactive date of April 23, 1982.

In December of 1986, Yancey and Midway entered into an agreed judgment in that action in the amount of $625,000.

By his first point of error, appellant alleges the trial court erred in granting appellees' motion for summary judgment because appellant was covered by all four underlying and umbrella policies, both at the time of the occurrence of the event precipitating the claim of professional errors and at the time the claim was made by the alleged injured party. Appellant contends that his coverage was continuous from the Yancey policy to the Diversified policy, and that he was covered by all four policies. The only changes made in the Diversified policy when The Yancey Agency was made an additional named insured was an address change for Diversified and a statement adding the second location of The Yancey Agency in Grapevine, Texas. The Diversified policy was in full force and effect until January 29, 1983.

Appellant alleges that the retroactive date on the Yancey policy is July 14, 1978, and on the Diversified policy is January 29, 1979; otherwise, the insurance contracts are identical. Basically, appellant argues that he is an insured of appellees from July 14, 1978, to January 29, 1983. Appellant

contends that he is covered by the two policies because he cannot control the time during which an alleged injured party seeks to sue him for damages. Appellant further contends the court should hold that he was covered by the policies as a matter law due to the ambiguity within the contracts and, further, as a matter of public policy.

■ We first address appellant's allegation that there was an ambiguity within the contracts, specifically that appellee would have to "add words" to the contract to exclude the appellant from coverage. By crosspoint, appellee contends appellant has waived the ambiguity argument pursuant to TEX.R.CIV.P. 166–A(c). We agree. Appellant has waived the issue on appeal that exclusion in the policy was ambiguous and should be strictly construed against the insurer by failing to raise the alleged ambiguity in the trial court. *See Allright, Inc. v. Pearson,* 735 S.W.2d 240 (Tex.1987); *Dorchester Development v. Safeco Ins.,* 737 S.W.2d 380, 383 (Tex.App.—Dallas 1987, no writ); TEX.R.APP.P. 52(a). Further, appellant does not cite any authority under which the exclusion in this case is ambiguous. Where points of error are raised for the first time on appeal, nothing is presented for review. *Dorchester,* 737 S.W.2d at 383; TEX.R.APP.P. 52(a). Nowhere in the written motions or other responses in the trial court does appellant refer us to his theory of ambiguity within the policies. Even had appellant not waived this specific issue, he would not prevail on appeal.

In a summary judgment case, the issue on appeal is whether the movant met his burden for summary judgment by establishing that there exists no genuine issue of material fact and that he is entitled to judgment as a matter of law. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979); TEX.R. CIV.P. 166–A. The burden of proof is on the movant, and all doubts as to the existence of a genuine issue as to a material fact are resolved against him. *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co.,* 391 S.W.2d 41, 47 (Tex.1965).

Therefore, we must view the evidence in the light most favorable to the non-movant. *See id.* In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to the non-movant will be accepted as true. *Montgomery v. Kennedy,* 669 S.W.2d 309, 311 (Tex.1984); *Farley v. Prudential Insurance Company,* 480 S.W.2d 176, 178 (Tex.1972). Every reasonable inference from the evidence must be indulged in favor of the non-movant and any doubts resolved in his favor. *Montgomery,* 669 S.W.2d at 311. Evidence which favors the movant's position will not be considered unless it is uncontroverted. *Great American,* 391 S.W.2d at 47. The function of the summary judgment is not to deprive a litigant of his right to trial by jury, but to eliminate patently unmeritorious claims and untenable defenses. *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 931 (1952). *See also Great American R. Ins. Co. v. San Antonio Pl. Sup. Co.,* 391 S.W. 2d 41, 46–47 (Tex.1965).

■ It is fundamental that insurance policies are controlled by rules of construction which are applicable to contracts generally. *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987). The determination of whether terms are ambiguous is a question of law. *Brooks, Tarlton, et al v. U.S. Fire Ins.,* 832 F.2d, 1358, 1364 (5th Cir.1987). The determination of whether a contract is ambiguous in light of its wording and the surrounding circumstances is a question of law, although once the contract is found to be ambiguous, the determination of the parties' intent through extrinsic evidence is a question of fact. *J.B. Watkins v. Petro–Search, Inc.,* 689 F.2d 537, 538 (5th Cir.1982). We must interpret and construe insurance policies liberally in favor of the insured and strictly against the insurer, especially when dealing with exceptions and words of limitation. *Kelly Associates, Ltd. v. Aetna Casualty and Surety Co.,* 681 S.W.2d 593, 596 (Tex.1984); *Blaylock v. American Guarantee Bank Liability Insurance Co.,* 632 S.W.2d 719, 721 (Tex.1982); *Ramsey v. Maryland American General Insurance Co.,* 533

S.W.2d 344, 349 (Tex.1976). When the language of a policy is susceptible of more than one reasonable construction, the courts will apply the construction that favors the insured and permits recovery. *Barnett*, 723 S.W.2d at 666; *Kelly*, 681 S.W.2d at 596; *Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1976); *Ramsay*, 533 S.W.2d at 349. Where the clause of the insurance policy subject to dispute involves exceptions or limitations on the insurer's liability under the policy, even more stringent construction than usual is required. *Glover*, 545 S.W.2d at 761; *Adrian Associates v. National Surety Corp.*, 638 S.W.2d 138, 140 (Tex.App.— Dallas 1982, writ ref'd n.r.e.). These special rules favoring the insured are only applicable where there is an ambiguity in the policy; if the term in question is susceptible of only one reasonable construction, then these rules do not apply. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex.1984); *Ranger Insurance Co. v. Bowie*, 574 S.W.2d 540, 542 (Tex.1978). The courts should not strain to find such ambiguity if, in so doing, they defeat the probable intentions of the parties, even when the result is an apparently harsh consequence to the insured. *Calcasieu– Maine Nat. Bank, Etc. v. Am. Emp. Ins.*, 533 F.2d 290, 295 (5th Cir.), *cert. denied*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). When there is no ambiguity in the term, it is the court's duty to give the words used their plain meaning, *Puckett*, 678 S.W.2d at 938; *Transport Insurance Co. v. Standard Oil Co. of Texas*, 161 Tex. 93, 337 S.W.2d 284, 288 (1960), unless the policy itself shows that the terms have been used in a technical or different sense. *Ramsay*, 533 S.W.2d at 349. Moreover, when an unambiguous contract exists, the contract alone will be deemed to express the intention of the parties, "for it is the objective, not the subjective, intent that controls." *Brooks*, 832 F.2d at 1364, *citing Watkins*, 689 F.2d at 538. The courts will neither create ambiguity in an insurance policy where none exists nor make a new contract for the parties; if the policy language is clear, unequivocal, and hence unambiguous, its terms will be enforced.

*Branders v. Nabors*, 443 F.Supp. 764, 769 (N.D.Miss.) *aff'd*, 579 F.2d 888 (5th Cir. 1978). The courts attempt to construe a contract so as to avoid rendering any of its terms meaningless. *Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n*, 783 F.2d 1234, 1238 (5th Cir.1986); *Blaylock*, 632 S.W.2d at 722. In *Ideal Mutual Insurance*, Justice Goldberg firmly stated that "unlike the deconstructionists at the forefront of modern literary criticism, the courts still recognize the possibility of an unambiguous text." *Id.*

■ An insurer is required to defend only those cases within the policy coverage. *Fidelity & Guar. Ins. Underwriters v. McManus*, 633 S.W.2d 787, 788 (Tex.1982). Pleadings and terms of the policy determine an insurer's duty to defend. *Heyden Newport Chemical v. Southern General Ins. Co.*, 387 S.W.2d 22, 24 (Tex.1965).

The ambiguity, although not specifically alleged, must come from the interpretation of: the contract as to whether the policies are "claims-made" or "occurrence" policies; the term "coverage" as to whether appellant was covered under the Diversified policy; the term "retroactive date" as to whether the two policies constituted one continuous policy; and the interpretation of the excess policies under the same above theories alleged under the primary underlying policies.

■ Appellant alleges that the policies are "occurrence" policies. We disagree. A "claims-made" policy covers occurrences which may give rise to a claim that comes to the attention of the insured and is made known to the insurer during the policy period. An "occurrence" policy covers all claims based on an event occurring during the policy period, regardless of whether the claim or occurrence itself is brought to the attention of the insured or made known to the insurer during the policy period. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535, n. 3, 98 S.Ct. 2923, 2926, n. 3, 57 L.Ed.2d 932 (1978); *Branders*, 443 F.Supp. at 767; *William M. Mercer, Inc. v. Woods*, 717 S.W.2d 391, 393 (Tex.App.— Texarkana 1986, writ granted).

■ Appellant's own policy with USFIC, the Yancey policy, stated on the front page of the document at the top of the page in block letters: "THIS IS A 'CLAIMS MADE' POLICY READ CAREFULLY." The endorsement attached to the document states that it applies to claims-made coverage; this statement is also at the top of the document in large print, bold type. The Yancey umbrella policy also has an endorsement attachment which also has the statement "THIS IS A 'CLAIMS MADE' COVERAGE PART—READ CAREFULLY," at the top of the document as part of the title, underlined, in capital letters, bold print. The Diversified policies, underlying, and umbrella, the endorsement and supplemental declarations, are identical to the Yancey policies.

The policies all have a two-page attachment entitled "INSURANCE AGENTS' AND BROKERS' ERRORS AND OMISSIONS POLICY." It is important to note that appellant, John Yancey, was an insurance agent himself and was familiar with these types of documents. Since he was obtaining from Diversified coverage in a field in which it may be assumed he possesses expert knowledge and skill, in addition to the fact that his policies and Diversified's policies are identical, strongly supports the conclusion that he fully understood and approved of the terms of the policies. The two-page attachment referenced above is a set of definitions and rules which apply to enforcement of the policies. The type of coverage is specifically stated in all the policies under this document:

### INSURING AGREEMENTS

I. **COVERAGE.** To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as money damages because of any claim or claims first made against the Insured *during the policy period,* arising out of any negligent act, error or omission, occurring subsequent to the retroactive date, in the conduct of the Insured's business of Insurance Agents or Insurance Brokers, and caused by the Insured or any other person for whose acts the Insured is legally liable, *except as excluded or limited by the terms, conditions or exclusions of this policy.*
....

### IV. POLICY PERIOD, TERRITORY.
....

*A claim is first made during the policy period ... if during the policy period ... the insured shall have* knowledge or become aware of any negligent act, error or omission which could reasonably be expected to give rise to a claim under this policy *and shall during the policy period or extended reporting period give written notice thereof to the Company.*

If any claim is first made during the policy period or extended reporting period, alleging money damages which are payable under this policy, any additional claims which are made, or suits or proceedings in connection therewith which are brought subsequent to the policy period or extended reporting resulting from the same or related negligent acts, errors or omissions shall be considered a part of the claim first made during the policy period or extended reporting period.

V. **PERSONS INSURED.** The unqualified word "Insured" wherever used includes the Named Insured and any partner, executive officer, director, stockholder or employee *while acting within the scope of their duties as such employment.*
....

### CONDITIONS

1. **DEFINITIONS.**
   (A) **"RETROACTIVE DATE"** means the date shown on the schedule of this policy. *However, if an Insured becomes an Insured under this policy subsequent to the retroactive date, the retroactive date for that insured shall be the same as that subsequent date.*

   (B) **"POLICY PERIOD"** means the period of *time between the inception date stated in the policy and the ef-*

*fective date of termination,* expiration or cancellation, but does not include any extended reporting period. [Emphasis added.]

We have reviewed other jurisdictions which have granted an insured coverage under this type of policy due to the manner in which it was written; none of the instances reported support the allegations by appellant in the case at bar. *Gyler v. Mission Insurance Co.,* 10 Cal.3d 216, 220, 514 P.2d 1219, 110 Cal.Rptr. 139, 141 (1973) (any implication restricting coverage must be rejected since it was not conspicuous, plain, and clear, being found in a part of the policy far below the basic insuring clause and not set off in bold type); *Chamberlin v. Smith,* 72 Cal.App.3d 835, 849–51, 140 Cal.Rptr. 493, 501–02 (1973); *Employers Reinsurance v. Mission Equities Corp.,* 74 Cal.App.3d 826, 829, 141 Cal. Rptr. 727, 729 (1977) (the use of the terminology within the policy of negligent acts or claims which "may be made" or "may have been made" during the policy period is ambiguous); *J.M. Brown Const. Co. v. D & M Mechanical Contr., Inc.,* 222 So.2d 93, 97–98 (La.Ct.App.1969) (claim must be filed during policy period in order for subsequent claim relating to original claim to be deemed made within the policy period; not an "occurrence" policy which applies regardless of the date of discovery); *Hunter v. Office of Health Services, etc.,* 385 So.2d 928, 937 (La.Ct.App.1980) (although excess policies were of the "occurrence" type, the underlying primary policies had been attached to and incorporated into them by reference, thus making the excess coverage dependent on the coverage provided by the underlying which were "claims-made" primary policies; therefore, since there is no liability under "claims-made" policies, then excess policies do not afford coverage); *Detroit Auto. Inter–Insurance Exchange v. Leonard Underwriters, Inc.,* 117 Mich.App. 300, 323 N.W.2d 679, 681–82 (1982) (contention that "claims-made" wording rendered ambiguous by the use of "may" in a portion of the policy unrelated to the section stating the type of claim obviously a strained and unreasonable allegation); *Brander v. Nabors,* 579 F.2d 888, 889–90 (5th Cir.1978) (Mississippi law; policy issued for period of November 12, 1968, to November 12, 1969, and renewed for the period of November 12, 1969, to November 12, 1970; contention rejected that policy was ambiguous as to whether coverage was made on an "occurrence" or a "claims-made" basis; the court found the policy a "claims-made" policy, and noted that the policy explicitly stated so in bold type, and that the risk was constantly defined throughout the policy in terms of the time within which claims must be made—standard language employed to define risk in "claims-made" liability insurance); *Rotwein v. General Accident Group,* 103 N.J. Super. 406, 247 A.2d 370, 375 (Law Div. 1968) (summary judgment granted in which acts or omissions which caused the accident occurred during the policy period, but were not reported during the policy period provided no coverage; the insuring clause not rendered uncertain or unambiguous by other provisions of the policy); *Samuel N. Zarpas, Inc. v. Morrow,* 215 F.Supp. 887, 888–89 (D.C.N.J.1963) (language clearly implied a "claims-made" policy; notice provision requiring immediate notification to insurer would be rendered meaningless if policy was an "occurrence" policy); *Cornell, Howland, Hayes & Merryfield, Inc. v. Continental Cas. Co.,* 465 F.2d 22, 25 (9th Cir.1972) ("claims-made" policy; no coverage for claim after close of the period of coverage afforded by the policy); *Gereboff v. Home Indemnity Co.,* 119 R.I. 814, 383 A.2d 1024, 1026–27 (1978) (court rejected insured's contention that the words "prior to the termination of the policy" ambiguous thus making it impossible to classify policy either as "occurrence" or "claims-made"; court stated that terms, when read in context, were clear).

Looking at the policies and the surrounding circumstances we find only one reasonable construction of the language in the policies and, therefore, no ambiguity within the policies before us; the Yancey and Diversified policies are "claims-made" policies. *Compare Gyler,* 10 Cal.3d at 219–20, 514 P.2d 1219, 110 Cal.Rptr. 139; *see also Chamberlin,* 72 Cal.App.3d at 835, 140 Cal.

Rptr. 493; *Employers Reinsurance*, 74 Cal.App.3d at 826, 141 Cal.Rptr. 727; *J.M. Brown Const.*, 222 So.2d at 93; *Hunter*, 385 So.2d at 928; *Detroit Auto.*, 323 N.W. 2d at 679; *Brander*, 579 F.2d at 888; *Rotwein*, 247 A.2d at 370; *Zarpas*, 215 F.Supp. at 887; *Cornell*, 465 F.2d at 22; *Gereboff*, 383 A.2d at 1024. The terms cited within the policies, given their plain meanings, clearly show that the policies only cover the periods listed. Therefore, appellant is not covered under the Yancey policy which ceased on July 14, 1982, because the claim was reported on September 10, 1982. Under a "claims-made" policy there is no coverage for a claim made after the termination date of the policy.

■ Addressing the other necessary issues to this point of error, we find that appellant was not covered under the Diversified policies. Under "Coverage," the policy states that it will pay for "any claim or claims first made against the insured during the policy period, arising out of any negligent act, error or omission, occurring subsequent to the retroactive date, in the conduct of the insureds." Within the Diversified and Yancey policies it clearly stated in the initial document, under "Conditions," the retroactive date of the policy changes should an insured come under the policy after the original retroactive date; his retroactive date becomes the date on which he was insured. The Diversified retroactive date is January 29, 1979. Appellant stipulated that he became an insured under the Diversified policy on April 23, 1982. This date, April 23, 1982, became Yancey's retroactive date under the terms of the Diversified policy.

The omission by Yancey in failing to obtain flood insurance for Midway occurred in October of 1981, prior to the subsequent date which applied to appellant under the Diversified policy. In addition, both the initial policy document and the endorsement state that an "insured" includes "any partner, executive officer, director, stockholder, employee or solicitor thereof, *while acting within the scope of his duties as such*" (emphasis added). Yancey was not acting within the scope of his duties as an employee of Diversified when he failed to obtain flood insurance for Midway; his negligence occurred while the owner of his own insurance agency.

Appellant further argues that the endorsement sent by appellees showing the Diversified policy extension until 1983, is proof that appellant is covered by the Diversified policy and that it would be futile to send the endorsement if he was not covered. This contention is also without merit. Appellant fails to refer to the portion of the policy which requires the error or omission to be committed while in the scope of his duties while working for Diversified. We find that appellant was not covered by the Diversified policies for the claim in question.

■ Finally, appellant's claim of "continuous coverage" also is not persuasive. As previously recognized, the transition from policy to policy creates a potential gap in coverage. *Mercer*, 717 S.W.2d at 393. Additionally, appellant went from being an owner of the original agency and its policies, to the recipient of coverage as an employee of a different company. It was stipulated that Diversified specifically refused to accept liability of The Yancey Agency when it purchased its assets. The Diversified policy itself, identical to Yancey's previous policy, expressly excludes claims for occurrences which predated the retroactive date of the policy. All of the above circumstances, when combined with appellant's knowledge as an insurer himself, conflicts with appellant's contentions. We find that there were two separate insurance policies under which appellant had separate, and different coverage under two insurance agencies.

Appellant's first point of error is overruled.

By his second and third points of error, appellant alleges the trial court erred in granting appellee's motion for summary judgment when there are material issues of fact as to the coverage of the policies in question, and concerning torts committed by appellees recoverable either with or without contract liability. With reference to appellant's contentions pertaining to ma-

terial issues as to the policies and alleged ambiguities therewith, appellant's second point of error is overruled for the reasons stated above. Appellant's third point of error specifically states that he relied on appellee's statements in the supplemental declarations, and ceased to attempt to procure coverage from any other source being under the impression that he was covered by the Diversified policies. Appellant argues that he was lead to change his position to his detriment and therefore, there are material issues of good faith and fair dealing which remain under the Texas Tort Claims Act and Deceptive Trade Practices Act. Appellant further contends that he is entitled to a trial on the issue of promissory estoppel.

■■■ The Texas Supreme Court holds that the doctrine of estoppel cannot be used to create insurance when none exists by the term of the policy. *Texas Farmers Ins. Co. v. McGuire*, 744 S.W.2d 601, 602–03 (Tex.1988). In the *Texas Farmers* case, the court noted that there is a difference in forfeiture cases versus the question of risk coverage under the insurance contract. *Id.* at 603. Estoppel will not rewrite and enlarge the risks covered by a policy, creating a new and different contract with respect to those risks covered. *Republic Insurance Co. v. Silverton Elevators, Inc.*, 493 S.W.2d 748, 751 (Tex.1973). As noted in the discussion under point of error one, there was no coverage under either policy for the claim made by Midway.

Considering the allegation of remaining material issues, we again decline to follow appellant's reasoning.

■■ A duty of good faith and fair dealing arises as a result of the special relationship in the insurance context arising out of the parties' unequal bargaining power, and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of insured's misfortunes in bargaining for settlement or resolution of claims. *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 133 (Tex.1988); *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 212 (Tex.1988), *citing Arnold v. Nat. County Mut. Fire Ins. Co.*,

725 S.W.2d 165, 167 (Tex.1987). In a cause of action for breach of duty of good faith and fair dealing, the claimant must establish: (1) the absence of a reasonable basis for denial of a claim or delay in payment of the benefits of the policy; and (2) that the carrier knew or should have known that there was not a reasonable basis for the denial or delay. *Aranda*, 748 S.W.2d at 213; *Arnold*, 725 S.W.2d at 167; *Lee v. Safemate Life Ins. Co.*, 737 S.W.2d 84, 85 (Tex.App.—El Paso 1987, writ dism'd); TEX.INS.CODE ANN. art. 21.21–2 (Vernon 1981). As a matter of law, the mere denial of a claim in itself does not give rise to treble damage liability under the Deceptive Trade Practices Act or article 21.21 of the Insurance Code. *Gen. Acc., Fire & Life Assur. Corp., Ltd. v. Legate*, 578 S.W.2d 505, 506 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.); *see also Rodriquez v. Texas Emp. Ins. Ass'n*, 598 S.W.2d 677, 679 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.). It is the insurer's denial of liability which forms the basis for the institution and maintenance of plaintiff's claim for the enforcement of contractual rights created by the policy. *General Accident*, 578 S.W.2d at 507.

The first element of this test requires an objective determination of whether a reasonable insurer under similar circumstances could have delayed or denied the claimant's benefits. The second element balances the right of an insurer to reject an invalid claim and the duty of the carrier to investigate and pay compensable claims. This element will be met by establishing that the carrier actually knew there was no reasonable basis to deny the claim or delay payment, or by establishing that the carrier, based on its duty to investigate, should have known that there was no reasonable basis for denial or delay. Under the test, carriers will maintain the right to deny invalid or questionable claims and will not be subject to liability for an erroneous denial of a claim. Carriers that breach the duty of good faith and fair dealing, however, will be subject to liability for their tortious conduct. *Aranda*, 748 S.W.2d at 213.

Yancey alleged that he suffered from a failure of the carriers to defend his case against Midway. In the case at bar, appellee pleaded and produced sufficient summary judgment proof to show the defense of no coverage under either policy as alleged by appellant. Because of the successful defense, that no insured loss occurred during the period of the policies in question and under their provisions, we believe there is no lack of good faith or unfair dealing on the part of appellees. *See Dorchester*, 737 S.W.2d at 384. Appellant's third point of error is overruled.

■■ Appellant further alleges in its reply brief a point slightly referred to in their original brief, that any attempt to restrict the retroactive date of the Diversified policy was an unlawful restriction on retroactive coverage in violation of public policy because there was only one insured throughout the policies. Appellant refers this court to a student comment contained in the Temple University Law Quarterly, and court decisions from three other jurisdictions cited therein, in support of his contention that "reasonable expectations" of the coverage should be the test by which insurance contracts are analyzed. Comment, *"Claims-made" Liability Insurance: Closing the Gaps with Retroactive Coverage*, 60 Temp.L.Q. 165 (1987).

In reviewing the history of occurrence and claims-made insurance policies, we find that occurrence policies originated when the primary function of insurance was to provide coverage for property loss at sea. *See* 8 W. Holdsworth, *The History of English Law* 273–74 (2d ed. 1977). This type of policy became a severe disadvantage for underwriters with the advent of more complex areas of insurance. Initially, the time lapse, or "tail," between the date of the error and the time the claim is made, prevents insurers from making precise calculations of premiums based upon the costs of the risks assumed. Occurrence policy premiums have, on numerous occasions, proven to be grossly inadequate to cover the inflationary increase in the cost of settling claims asserted years later. J. Parker, *The Untimely Demise of the "Claims-made"*

*Insurance Form? A Critique of Stine v. Continental Casualty Company*, 1983 Det.C.L.Rev. 25, 70–71. Additional theories of recovery in tort law have contributed to an increase in the number of claims that undermines the actuarial basis for premiums on occurrence policies issued years earlier. Shand, *"Claims-made" vs. "Occurrence,"* 28 Int'l Ins. Monitor 269, 270 (Sept.1974). A further disadvantage of occurrence policies is that their long tail exposure can lead to situations in which the insurer is no longer in existence at the time a claim is finally made. R. Mallen and V. Levit, *Legal Malpractice*, section 709 at 889 (2d ed. 1981). Although this long tail is less of a problem with automobile accidents where the time and place of the incident are easily identified, with reference to professional malpractice and long-term exposure to hazardous environmental conditions the injury and corresponding negligence are often not discoverable until years later, thus making the long tail exposure a significant problem. Kroll, *The Professional Liability Policy "Claims Made,"* 13 Forum 842, 845 (1978). Another problem in utilizing occurrence policies is when latent injuries occur over an extended period of time; both the insurer and insured are met with the difficulty in determining precisely when the actual causal event occurred. These results are particularly seen in products liability, professional malpractice, and environmental litigation. R. Mallen and V. Levit, sec. 709 at 889–90.

The advantages to an insurer from underwriting claims-made policies are fairly obvious. The insurer gains the ability to calculate risks and premiums with greater precision since exposure to claims ends at a fixed point, usually at the termination of the policy. Parker, 1983 Det.C.L.Rev. at 73. This allows the insurer to establish reserves without considering future increases in jury awards, inflation or new negligence theories that would make the insurer liable for unanticipated risks. Comment, 60 Temp.L.R. at 178.

There are benefits to the insured as well. Claims-made policies aid in making insurance more available and less expensive than occurrence policies. Parker, 1983

Det.C.L.Rev. at 29, n. 12; *see also* Gibson, *New CGL Forms Attacked, Defended,* Bus. Ins., 1, 11 (April 29, 1985). The claims-made policy allows the insured to purchase on a contemporary basis; it can afford protection in current dollars for liability that may be based on negligence that occurred years earlier. Kroll, 13 Forum at 847. The insured can purchase liability based on current trends and jury verdicts. Kroll, *"Claims-made"—Industry's Alternative: "Pay as You Go" Products Liability Insurance,* 637 Ins.L.J. 63, 66 (Feb. 1976). It has been theorized that the introduction of claims-made policies has stabilized the insurance markets in which they are utilized. Shand, *Is Your Policy on a "Claims-Made" Basis?,* Weekly Underwriter 1, 8 (Sept. 15, 1973). Claims-made policies are advantageous to those professionals who cannot afford liability insurance during the first few years of practice; some professionals have found that the claims-made policy is the only type of policy available to them. Comment, 60 Temp. L.R. at 179–80; Shand, 28 Int'l Ins. Monitor at 269.

We turn to address issues within the cases heavily relied upon by appellant. The Supreme Court of New Jersey, in *Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 495 A.2d 406 (1985), compared its holding with that of *Zuckerman v. Nat. Union Fire Ins.,* 100 N.J. 304, 495 A.2d 395 (1985), decided on the same day. The insurance contract in the *Sparks* case provided no retroactive insurance; the retroactive date set forth in the policy was the same as the effective date of the coverage. *Sparks,* 495 A.2d at 408. In comparison, the policy in *Zuckerman* was a standard claims-made policy, providing unlimited retroactive coverage and no prospective coverage at all. *Id.; Zuckerman,* 495 A.2d at 398. The advantages of a claims-made policy were noted, and the court referred to *Zuckerman* for an in-depth explanation. *Sparks,* 495 A.2d at 409. The court reiterated that courts throughout the country have upheld the validity of claims-made policies and, although these policies were regularly challenged on public policy grounds, the vast majority of courts have enforced the poli-

cies as written. *Id.* Those courts which have declined to enforce claims-made policies, as in *Gyler v. Mission Ins. Co.,* 10 Cal.3d 216, 514 P.2d 1219, 110 Cal.Rptr. 139 (1973), also cited by appellant, have based their decisions on special factual circumstances. *Sparks,* 495 A.2d at 410. The court stated that other state and federal courts confronted with claims-made policies providing limited or no retroactive coverage have declined to follow *Jones v. Continental Casualty Co.,* 123 N.J.Super. 353, 303 A.2d 91 (N.J.Super.Ct.Ch.Div.1973) (claims-made policy invalidated due to retroactive coverage). *Sparks,* 495 A.2d at 411. Those cases rejected *Jones* because unambiguous provisions of the policies clearly restricted coverage, and premiums were presumably reduced to reflect limited protection; therefore, there was no basis on which to invalidate the limitations on coverage. *Id.,* n. 3.

The courts do not lightly interfere with freedom of contract, and the principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which the doctrine rests. These rules are applied realistically with regard to insurance contracts, which are subjected to careful scrutiny to avoid injury to the public. *Id.* 495 A.2d at 412. We note that the *Sparks* court analyzed the issue by referring to cases which involve contract language which was highly technical and difficult to understand. *Id.* 495 A.2d at 413. Although the court held against the particular policy in the case before them, they noted that "claims-made" policies with no retroactive coverage might be appropriate in certain contexts, such as where the policies were offered at a reduced premium to a professional in his first year of practice, or to the professional who changes from "occurrence" to "claims-made" protection. *Id.* 495 A.2d at 415, n. 4.

Citing twenty-four cases from different jurisdictions, the *Zuckerman* court also stated that claims-made policies had been upheld by the vast majority of federal and state courts, either by upholding their validity against public policy challenges or

simply enforcing the contracts. *Zuckerman,* 495 A.2d at 400. In only a small number of cases have the courts refused to uphold coverage limitations of claims-made policies, and these presented special factual circumstances. *Id.* 495 A.2d at 402. The court found no considerations of public policy that would inhibit the enforcement of the "claims-made" policy issued to the appellant; the provisions within the policy were unambiguous. *Id.* 495 A.2d at 404. The court also stated the following as to any changes which might be made and potential injury from such policies:

> The public policy interest at stake in such cases, however, is better vindicated by legislation or regulation designed to assure uninterrupted malpractice insurance coverage for professionals rather than by the invalidation of "claims made" policies. A member of the public served by a professional with no insurance or by one whose "occurrence" policy has lapsed is as subject to injury and prejudice as a client serviced by a professional whose "claims made" policy has not been renewed. The potential for public injury derives more from the termination or nonexistence of coverage than it does from the form of the policy. Accordingly, we do not consider the standard "claims made" form of coverage to contravene public policy either from the standpoint of the professional or the professional's clients.

*Id.* 495 A.2d at 404–05.

■■■■ In considering whether a contract is contrary to public policy, the test is whether the tendency of the agreement is injurious to the public good, not whether its application in a particular case results in actual injury. *Hazelwood v. Mandrell Industries Co.,* 596 S.W.2d 204, 206 (Tex.Civ. App.—Houston [1st Dist] 1980, writ ref'd n.r.e.). As appellee has pointed out to this court, claims-made policies have been upheld by many jurisdictions as not offending public policy. The policies in the case at bar are unambiguous, and are by their terms "claims-made" policies under which any claim must be made during the policy period. The policy leaves no room for construction in favor of the insured. Nor does

it mandate the application of the "reasonable expectations" doctrine. *J.M. Brown,* 222 So.2d at 99. Appellant's point of error is overruled.

The judgment of the trial court is affirmed.