The MILLERS CASUALTY
INSURANCE COMPANY
OF TEXAS, Appellant,

v.

Golda A. LYONS, Appellee.

No. 11–89–039–CV.

Court of Appeals of Texas,
Eastland.

Sept. 13, 1990.
Rehearing Overruled Nov. 29, 1990.

Scott P. Stolley, Leo John Jordan, Thompson, Coe, Cousins & Irons, Dallas, for appellant.

Steve Sumner, Brian Bethune, Kyle A. Morrow, Sumner & Schick, Dallas, Christine Karol Roberts, Carona Del Mar, Cal., for appellee.

## OPINION

McCLOUD, Chief Justice.

Golda Lyons sued her insurer, The Millers Casualty Insurance Company of Texas, on an insurance contract and for unfair claims settlement practices. Lyons alleged that her home was damaged on April 29, 1984, as a result of a windstorm. Millers answered that the damages were caused by "settling, cracking, bulging, shrinkage, or expansion" of the foundation, a condition excluded by the policy of insurance. The jury found that 75 percent of the damages to plaintiff's home was proximately caused by "settlement of structure" and that 25 percent was caused by "windstorm." The jury determined that it would cost $25,000 to repair plaintiff's residence. The trial court reduced this amount by 25 percent, the damage caused by windstorm, and awarded plaintiff $6,250 for damages under the contract. The jury further found that Millers' refusal to pay plaintiff's claim was in bad faith and that Millers had knowingly engaged in false, misleading, or deceptive acts or practices in relation to plaintiff. The jury found actual damages of $75,000 in addition to the cost of repair damages and found exemplary damages of $8,700 under Section 17.50(b)(1) of the Texas Deceptive Trade Practices Act, TEX. BUS. & COM.CODE ANN. § 17.41 et seq. (Vernon 1987 & Supp.1990). We reverse

and render in part, and we reverse and remand in part.

### Good Faith and Fair Dealing

■ The jury found in Question No. 3 that Millers' refusal to pay plaintiff's claim was in bad faith. The instruction accompanying Question No. 3 defined bad faith in the language set forth in *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210 (Tex.1988), stating that an insurance company acts in bad faith when there is no reasonable basis to deny the claim and the insurance company knew or should have known that there was no reasonable basis to deny the claim.

The first element of bad faith requires an objective determination of whether a reasonable insurer under similar circumstances would have denied the plaintiff's claim. The second element balances the right of Millers to reject an invalid claim and the duty of Millers to investigate and pay compensable claims. This element is met by establishing that Millers actually knew there was no reasonable basis to deny the claim or that, based on its duty to investigate, Millers should have known that there was no reasonable basis for denial. Under the test, insurers will "maintain the right to deny invalid or questionable claims" and will not be subject to liability for an erroneous denial of a claim. *Aranda v. Insurance Co. of North America*, supra at 213; *Yancey v. Floyd West & Company*, 755 S.W.2d 914, 922 (Tex.App.—Fort Worth 1988, writ den'd).

The record reflects that plaintiff lived in a two-story frame structure. The outside walls were covered with brick veneer. A wooden staircase was located at the back of the house and served as an outside entrance to an upstairs apartment. The wooden staircase was supported by four "4 × 4 legs."

On April 29, 1984, a storm occurred. Plaintiff heard a loud noise, but she did not know whether anything actually hit her house. The following morning, she went into her backyard with a next-door neighbor. One of a cluster of hackberry trees, located approximately five feet away from the house on the outside edge of the staircase, had fallen perpendicular to and in the opposite direction from the staircase and back wall of the house. Another tree in the cluster, located near the outer edge of the staircase, remained standing. The morning after the storm was the first time plaintiff noticed that the back wooden stairway was standing "out of kilter" and that there was damage to the brick veneer.

On May 7, 1984, an independent insurance adjuster, Hal Benoy, inspected the residence. On May 15, 1984, Benoy returned to plaintiff's residence; took photographs of the home; and brought Charlie Herman, a contractor in the building and reconstruction business, to inspect the residence. Herman had been in the reconstruction business for 12 years and in construction for 25 years. In the previous 12 years, he had examined thousands of homes, and he had specifically examined brick veneers to determine the cause of damage to the veneers and had examined homes to determine the existence of foundation settlement. Herman observed a deteriorated, rotten, and unsafe staircase landing; numerous cracks around the house; a cracked foundation to the right of the staircase; and that brick veneer had fallen off around the stairwell and window. On May 15, 1984, Herman sent a written report addressed to plaintiff and to Benoy expressing Herman's opinion that the damage to plaintiff's brick veneer wall was caused by severe shifting of the foundation. On May 20, 1984, Benoy sent the first letter to plaintiff denying the claim, advising that no claim was present under the policy, and stating that, in his opinion as well as Herman's, the damage was not caused by the windstorm but rather the shifting of the foundation.

Plaintiff disagreed with the determination of the cause of damage. Benoy then employed a second person to inspect plaintiff's home. On September 5, 1984, Clyde M. Hardy of Hardy Engineering Company, a registered professional engineer specializing in damage and failure analysis, inspected plaintiff's home. Hardy observed cracks and separation in the mortar be-

tween bricks that had been refilled, a tremendous amount of separation from corners of masonry openings and various panels of brick, a rotten staircase landing, and considerable space between the inside edge of the staircase and the brick wall. On September 20, 1984, Hardy sent Benoy a written report which included diagrams and photographs of the home and expressed the opinion that:

There is no question but what the cracks and movements were pronounced and large prior to the storm. The storm did not produce the cracks and separations observed on this wall. We do not believe that the storm caused the brick veneer to fall out from the structure.

CONCLUSION

It is our opinion that the partial collapse of the brick veneer on the west one-half of the Lyon's duplex is the ultimate result of differential settlements of this foundation and the lack of maintenance to the structure. It is also our opinion that the falling tree did not cause the partial collapse observed.

The photographs showed numerous old cracks and separations in the brick veneer wall of the house. Several cracks had been "re-pointed" or patched in the past. The photographs showed clearly the different colored mortar used in the past to repair the brick veneer.

On October 5, 1984, Benoy sent a second letter to plaintiff denying the claim and enclosed a copy of the Hardy Engineering Company report. The letter stated that settlement [of structure] was specifically excluded in plaintiff's policy and concluded: "We therefore repeat our former assertion that no claim is present under your policy, and is herewith denied."

On August 19, 1985, 16 months after the storm, Marcus Avila, an expert retained by Lyons, inspected plaintiff's home. On August 26, 1985, he sent a written report to Lyons stating that the:

[B]rick veneer was dislocated outward as a result of the windstorm, which probably produced normal (perpendicular) wind loads of approximately 24,000 P.S.F. [pounds per square foot] at the stair

landing (2nd floor) level and approximately 26,000 P.S.F. at a location approximately 3 feet below the stair landing level.

The report concluded: "The dislodged brickwork was a *direct result* of the wind forces which were transmitted by the falling tree(s), Directly onto the face brick." (Emphasis in original)

Avila's degree was in architecture, but he was not licensed. He did not have a degree in engineering nor was he a registered professional engineer. His experience was primarily designing cement plants and rock crushing plants. Plaintiff's home was his only experience in investigating or inspecting a residential foundation, although he had looked at foundations of cement plants.

By the time Avila inspected the home, a second storm had occurred and the stairway had completely collapsed. The brick veneer had also fallen away, exposing the exterior wood structure. This was after Millers' insurance coverage had expired.

The information available to Millers concerning plaintiff's claim showed that plaintiff heard a crash during the storm but that she did not know if anything actually hit her house. There is no evidence that any of plaintiff's neighbors spoke to Millers about plaintiff's damage. There is no evidence in the record of any information given to Millers other than the opinions, reports, photographs, and diagrams following inspections by Millers' adjuster and two experts except plaintiff's position that the fallen tree hit her house and Avila's written report dated August 26, 1985, which was based on an inspection 16 months after the storm and after the stairway had collapsed and some of the brick veneer had fallen from the wall.

Avila's report theorized that the windstorm caused the damage by causing the remaining standing tree from the cluster to hit the stairway and that the brick veneer was dislocated outward by the storm's "wind loads of approximately 24,000 P.S.F. ... and 26,000 P.S.F. ..." at two contact points. Avila's theory that the remaining tree hit the wooden staircase and caused

damage to the house was different than plaintiff's claim that the fallen tree hit her house.

As the case was prepared for trial, the information available to Millers reflected that, in regard to Avila's written report (the only information in plaintiff's favor other than plaintiff's own assertion to Millers), Avila, during his deposition, could not determine how to calculate the wind loads stated in his report.

At trial, Avila ultimately testified that a force as great as 24,000 pounds per square foot would flatten the house. He explained that the figures in the report were based on "code numbers." Avila testified that the amount of pressure and impact against the house had no bearing on his opinion. However, there is no evidence that Avila had an opinion contrary to his written report or that such additional opinions or any other information which could serve as a basis for paying the claim were relayed to Millers prior to trial.

Harold E. Taft, a meteorologist who testified as an expert witness for Millers, had a degree in mathematics and physics. In 1942 and 1943, Taft did graduate work at the Air Force Technical Institute. He was a staff weather officer during the Korean War and had attended summer school at either "MIT or UCLA" for twenty years. Taft testified that in his opinion a wind of 3,128 mph would be necessary to cause the 24,000 pounds per square foot wind load stated in Avila's report.

Taft conducted a meteorological survey of plaintiff's neighborhood prior to trial as to whether the neighborhood had any damage from the April 1984 storm. The survey consisted of written reports by the neighbors, signed by the individuals. All of the neighbors interviewed reported no known damage. Plaintiff's next-door neighbor and one of her trial witnesses reported, "No known damage to property, her property or elsewhere in neighborhood." Millers' weather expert determined that, on the afternoon of the storm, winds were 17 mph and gusting to 22–25 mph. The peak wind for the afternoon was 40 mph. Taft testified that wind velocities of such nature are not unusual in the Dallas area and that, when winds reach 60–70 mph, wind damage can occur, usually to the roof corners first. Taft stated that he commonly analyzes storm damage reports and that he found no reports of roof damage for this storm. He also calculated the force of a 40 mph wind, the peak wind for the afternoon, as imposing directly on a structure a wind force of 4 pounds per square foot, although this figure did not contemplate the wind causing something else to hit the structure.

We find no evidence to support the first element of bad faith as defined in the jury instruction: that there was no reasonable basis to deny the claim. Millers conclusively established that a reasonable insurer under similar circumstances would have denied plaintiff's claim. We also find no evidence of the second element: that the insurance company knew or should have known there was no reasonable basis to deny the claim. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960).

Millers should not be subject to liability for the denial of plaintiff's claim, even if the denial was erroneous. Insurance carriers maintain the right to deny questionable claims without being subject to liability for an erroneous denial of a claim. *Aranda v. Insurance Co. of North America*, supra. Following inspections a short time after the storm, two experts unequivocally stated their opinions that the damage was caused solely by foundation settlement, an exclusion under the policy. A weather expert conducted a meteorological survey and found no damage resulting from the storm. Photographs taken of the property reveal large cracks in the brick veneer that could not have been caused by the storm. It was undisputed that the tree that fell was approximately five feet from the house and that it fell in the opposite direction from the house. Plaintiff produced no evidence of any other information provided to or available to Millers contrary or in conflict with Millers' experts' reports other than plaintiff's claim that the fallen tree hit her house and Avila's written re-

port. Avila's report was based upon an investigation made 16 months after the storm and after the condition of the house had substantially changed, was based upon a different theory than plaintiff's claim, and expressed wind load figures against plaintiff's home which greatly differed from calculations of Millers' weather expert. The record establishes that plaintiff's claim was questionable. See *National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. Hudson Energy Company, Inc.,* 780 S.W.2d 417 (Tex. App.—Texarkana 1989, writ granted); *Fuentes v. Texas Employers' Insurance Association,* 757 S.W.2d 31 (Tex.App.—San Antonio 1988, no writ).

We point out that the evidence in the instant case is clearly distinguishable from the facts in *Wm. H. McGee & Co., Inc. v. Schick,* 792 S.W.2d 513 (Tex.App.—Eastland 1990, application pending), wherein this Court held that the evidence was sufficient to support a jury finding of bad faith. In *McGee,* there was no question as to coverage under the policy; the insurer's expert had provided the insurer with an estimate showing that the insurer owed the insured a substantial amount of money under the policy; and the insurer at no time made any offer of payment to the insured.

### Section 17.46(a) of the DTPA

■ The jury found in Question No. 5 that Millers engaged in "false, misleading, or deceptive acts or practices in relation to plaintiff, that was a producing cause of damages" to plaintiff.

Millers contends that there are no pleadings to support the submission of Question No. 5. We agree. Plaintiff cites *Vail v. Texas Farm Bureau Mutual Insurance Company,* 754 S.W.2d 129 (Tex.1988), and argues that Question No. 5 is a proper submission of Section 17.46(a) of the

DTPA. The Court in *Vail* held that TEX. INS.CODE ANN. art. 21.21, § 16(a) (Vernon Supp.1990) permits recovery for any practice defined as an unlawful deceptive trade practice by Section 17.46 of the DTPA. The *Vail* Court stated that this included the "unlisted" acts in Section 17.- 46(a) [1] as well as the "listed" acts in 17.- 46(b).

We have carefully examined plaintiff's sixth amended original petition where she alleges violations of Article 21.21 of the Texas Insurance Code. Plaintiff's allegations are very specific. The petition states:

> Such conduct, collectively and severally, violates Article 21.21, TEX.INS.CODE Sections 4 and 7(b) and Board Order 18663 (Dec.1971), 41060 (June 1982), and 41454 (August 1982).

Plaintiff does not allege that Millers violated Section 17.46 of the DTPA. Millers properly objected that there were no pleadings to support the submission of Question No. 5. The trial court submitted a theory of recovery not alleged by plaintiff. We hold that the submission of Question No. 5 constituted a substantial, misleading, and prejudicial departure from plaintiff's pleadings. *Stone v. Lawyers Title Insurance Corporation,* 554 S.W.2d 183 (Tex.1977). The trial court committed reversible error. We point out that, in *Vail,* the claimant alleged in general terms that the insurance carrier had employed or used acts "which violate Art. 21.21 of the Texas Insurance Code." In the instant case, plaintiff alleged very specifically that Sections "4" and "7(b)" of Article 21.21 were violated.

■ Furthermore, we agree with Millers that there is no evidence that Millers engaged in "false, misleading, or deceptive acts or practices in relation to plaintiff." The evidence reveals that Millers promptly investigated the claim, employed experts to

---

1. In *Wm. H. McGee & Co., Inc. v. Schick,* supra, this Court followed *Vail* and applied the language stated in *Vail* to a 17.46(a) violation but suggested that Section 16(a) of Article 21.21 of the Insurance Code referring to practices "defined" by Section 17.46 relates only to the "listed" (which are the defined) practices in Section 17.46(b). We made such suggestion because we concluded that the thrust of *Vail* concerned the existence of a cause of action and the adequacy of pleadings. We also held in *McGee,* citing *Spradling v. Williams,* 566 S.W.2d 561 (Tex. 1978), that a question similar to Question No. 5 was an immaterial question because it was not a jury finding of an act or practice which, on its face, showed that it was capable of being a deceptive trade practice.

investigate and evaluate the claim, and then denied the claim based upon the opinion and conclusions of its experts. We have earlier held that there is no evidence that Millers knew or should have known that there was not a reasonable basis for denying the claim. There is no evidence of any acts, practices, statements, or representations which were false, misleading, or deceptive.

### Insurance Contract

In Question No. 2, the jury was asked to find the percentage of damage caused to plaintiff's residence by settlement of structure and by windstorm. Millers objected to the question because it contained only the word "settlement" and because the exclusion urged by Millers excluded loss caused by "settling, cracking, bulging, shrinkage, or expansion of foundations." In describing the foundation, the various experts used the terms settlement, cracked, shifted, expansion, raising, and shrinking. There was considerable evidence as to "cracks" in the foundation.

■ The trial court committed reversible error in not submitting Question No. 2 in the language of the policy exclusion. See *Mutual Life Insurance Company of New York v. Steele*, 570 S.W.2d 213 (Tex. Civ.App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.). Also, the trial court erred, over Millers' objection, in not placing the burden of proof on plaintiff to prove that her damages were not caused by the exclusion provisions relating to the foundation of the residence. TEX.R.CIV.P. 94; *Hardware Dealers Mutual Insurance Co. v. Berglund*, 393 S.W.2d 309 (Tex.1965). For these errors, the contract cause of action will be reversed and remanded.

■ We disagree with Millers' contention that there is no evidence or, alternatively, factually insufficient evidence to support the jury's finding in Question No. 1 that plaintiff's residence was damaged by windstorm and the finding in Question No. 2 as to the percentage of damage proximately caused by settlement and windstorm. In reviewing Millers' no evidence challenge, we will consider only the evidence and the inferences tending to support the finding and disregard all evidence to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). We will examine and consider all the evidence in reviewing the factual insufficiency challenge to determine if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly unjust. *Pool v. Ford Motor Company*, 715 S.W.2d 629 (Tex.1986).

■ The jury could have properly concluded from the evidence presented by plaintiff that her house was damaged as a result of the windstorm on April 29, 1984. Plaintiff was not required to prove with mathematical exactness the percentage of damage resulting from windstorm and settlement. Plaintiff's evidence afforded a reasonable basis for estimating the amount of damage or the proportionate part of the damage caused by the windstorm. *Travelers Indemnity Co. v. McKillip*, 469 S.W.2d 160 (Tex.1971). Millers' no evidence and factually insufficient evidence points are overruled.

We disagree with Millers' assertion that Question No. 2 is not an ultimate question. Question No. 2, although incorrectly worded, supports plaintiff's theory of recovery.

We agree with Millers that there is no evidence to support the jury's award of $25,000 as the cost to repair the dwelling. There is, however, both legally and factually sufficient evidence of a lesser amount.

The jury finding in Question No. 7 that plaintiff should be awarded $8,700 exemplary damages under Section 17.50(b)(1) of the DTPA becomes an immaterial finding since we have determined that plaintiff has failed to show a violation of Article 21.21 of the Texas Insurance Code or a violation of the DTPA.

The judgment of the trial court is reversed and rendered as to all causes of action other than plaintiff's cause of action on the insurance contract and for attorney's fees. The judgment for the cost of repair under the insurance contract and the award of attorney's fees is reversed, and that portion of the cause is remanded.